# EXHIBIT A

## AGREEMENT OF SALE

THIS AGREEMENT, is made as of this 30th day of September 2011 by and between AMERICAN DRIVELINE CENTERS, INC., a Pennsylvania corporation ("SELLER"), and Gerald H. Hansen ("BUYER").

WHEREAS, SELLER is an affiliate of AAMCO Transmissions, Inc. ("ATI"), a franchisor of transmission and general automotive repair retail centers;

WHEREAS, SELLER desires to sell to BUYER assets associated with an AAMCO Transmission Center, located at 8844 Kingston Pike, Knoxville, TN 37923 (the "Center") pursuant to a Franchise Agreement with ATI and the terms stated herein;

WHEREAS, BUYER wishes to purchase from SELLER assets associated with the Center pursuant to the terms stated herein;

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.  **Purchase and Sale.**

    1.1.    Sale of Assets.

        (a)    Purchased Assets.  Upon the terms and subject to the conditions of this Agreement, BUYER agrees to purchase from SELLER and SELLER agrees to sell, transfer, convey, assign, and deliver to BUYER on October 26, 2011 ("Closing Date") all right, title, and interest in and to all of the assets listed in Schedule 1.1(a) hereto ("Purchased Assets"). The Purchased Assets must be delivered free and clear of any encumbrances or adverse interests of any kind; provided however, that should any of the Purchased Assets be found to be encumbered, then SELLER must, within fifteen (15) business days of written notice of such encumbrance and at its sole expense, either i) pay to have such encumbrance removed or ii) replace all encumbered assets with similar assets of equal or greater value as the encumbered Purchase Assets in question and, in either case, SELLER will not be subject to additional damages for such encumbrance(s). The Purchased Assets do not include any intellectual property, other than the right to use such intellectual property under the terms and conditions set forth in the AAMCO franchise agreement and related franchise documents between Buyer and Seller, through Seller's affiliate ATI, for the operation of the Center.

        (b)    Additional Items.  Included in the Purchase Price established in Section 1.3 herein, and in addition to the Purchased Asset, is the full credit of the AAMCO license fee of $39,500, the full credit of the $6,000 AAMCO transfer fee, and the full credit of the $3,000 AAMCO corporate training fee to the extent such fee is required to be paid.

    1.2.    Assumption of Liabilities.

(a)  Assumed Liabilities.  Upon the terms and subject to the conditions set forth herein, BUYER agrees that, as of the Closing Date, BUYER must undertake, assume, and agree to perform, and otherwise pay, satisfy and discharge all obligations and liabilities of the SELLER that are related to its operation of the Center and have accrued from the date of Closing, which specifically include without limitation the obligations to i) honor all AAMCO warranty work on repairs originally performed at the Center as required by the AAMCO franchise agreement and related documents, ii) pay the remaining balance of any existing Yellow Page (or similar telephone directory) advertising Contract related to the Center, and iii) be responsible for all obligations under the AAMCO franchise agreement and related documents as such obligations pertain to the Center or to being an AAMCO franchisee.

1.3.  The Purchase Price.



(a)  Purchase Price.  On the terms and subject to the conditions set forth in this Agreement, as consideration for the Purchased Assets, BUYER must pay to SELLER the purchase price of $210,000 (the "Purchase Price") as follows: (i) a $150,000 initial deposit paid by BUYER to SELLER via wire transfer initiated no later than 4:00 p.m. EST on Friday, September 30, 2011; and (ii) $60,000 via bank check, or wire transfer received no later than October 7, 2011.

2.  **Representations and Warranties.**

2.1.  Representations and Warranties of SELLER.  SELLER represents and warrants to BUYER that the following statements are, to the best of its knowledge, either correct and complete as of the date of this Agreement or will be correct and complete as of the Closing Date:

(a)  Organization.  SELLER is a corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.

(b)  Binding Obligation.  SELLER has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to carry out the transactions contemplated hereby.  The shareholders and Board of Directors of SELLER that must authorize, have duly authorized the execution and delivery of this Agreement and the other transactions contemplated hereby, and no other actions on the part of SELLER are necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by SELLER and constitutes a valid and binding obligation of SELLER enforceable in accordance with its terms.

(c)  Purchased Assets.  SELLER, by the Closing Date, will have good and valid title to the Purchased Assets, in each case, free and clear of all encumbrances or adverse interests of any kind; however, if the Purchased Assets are later found to be encumbered, SELLER and BUYER agree to abide by Section 1.1(a). The Purchased Assets constitute all of the assets used in and necessary for the conduct of the AAMCO business at the Center (the "Business") as presently conducted by SELLER and as presently proposed to be conducted.  Each of the Purchased Assets is free from defects, other than imperfections resulting from normal wear and tear, has been maintained in accordance with normal industry practice, has no deferred maintenance with respect thereto, is in good operating condition and repair (subject to normal

wear and tear), is suitable for the purposes for which it presently is used and presently is proposed to be used, and conforms, in all material respects, to all applicable ordinances, rules, and regulations, including all applicable building, zoning, and other laws and ordinances.

(d)     Real Property.  A true and correct copy of the lease associated with the Center that is between the landlord of the Premises ("Landlord") and SELLER that BUYER must take assignment of (the "Lease") is attached hereto as Schedule 2.1(d) and such Lease must be executed by BUYER on or before the Closing Date and will commence on November 1, 2011.  The Lease is legal, valid, binding, enforceable, and in full force and effect in accordance with its express terms and will continue as such on identical terms following the consummation of the transactions contemplated hereby.  Neither SELLER nor Landlord has failed to fulfill all material obligations required to have been performed by it under the Lease prior to the date hereof.  SELLER is not, and (to the knowledge of SELLER) Landlord is not, in breach or default, and no event has occurred which with notice or lapse of time (or both) would constitute a breach or default, or permit termination, modification, or acceleration, under the Lease

(e)     Litigation.  There is no private or governmental action, suit, proceeding, claim, mediation, arbitration, or investigation pending before any governmental entity, or, to the knowledge of SELLER, threatened against SELLER that are associated with the Center or the Purchased Assets of which SELLER has been notified.

(f)     Financial Information.  Attached hereto as Schedule 2.1(f) is the profit and loss statement (the "Financial Statements") from the operations of the Center for the four week period ended on August 27, 2011 (the "Measuring Date").  The Financial Statements have been prepared in accordance with accrual accounting principles, present fairly the results of operations of the Center for the period covered thereby, are correct and complete in all material respects, and are consistent with the books and records of SELLER relating to the Center (which books and records are correct and complete in all material respects).  There does not, and there will not at Closing, exist any fact, event, condition, or claim known to the SELLER which would cause a material adverse change in the Financial Statements as presented.

(g)     Standard of Work.   All work performed at the Center during the period SELLER has operated the Center has been performed in accordance with AAMCO and industry standards.

(h)     Absence of Certain Changes.  Since the Measuring Date, there has not been any change that is (or, so far as can reasonably be determined, is reasonably likely to be) materially adverse to the Purchased Assets, properties, Business, current or future condition (financial or otherwise) or current or future results of operations or prospects of the Business, in consideration of all relevant facts and circumstances known to SELLER.

(i)     Disclosure.  None of the representations and warranties made by SELLER in this Agreement or in any letter, certificate, or memorandum furnished or to be furnished by SELLER, or on its behalf, contains or will contain any untrue statement of a material fact, or omits any material fact the omission of which would make the statements made therein or herein misleading.

2.2.   Representations and Warranties of BUYER.  BUYER represents and warrants to SELLER that the following statements are, to the best of its knowledge, either correct and complete as of the date of this Agreement or will be correct and complete as of the Closing Date:

(a)   Organization.  BUYER is an individual residing in the State of Florida.

(b)   No Restrictions.  BUYER is not a party to any judgment, injunction, order, decree, covenant, or contract that restricts or prohibits BUYER, before or after the Closing Date, from freely engaging in the operation of the Center or using any of the Purchased Assets.

(c)   Disclosure.  None of the representations and warranties made by BUYER in this Agreement or in any letter, certificate, or memorandum furnished or to be furnished by BUYER, or on its behalf, contains or will contain any untrue statement of a material fact, or omits any material fact the omission of which would make the statements made therein misleading.  There is no fact known to BUYER that materially adversely affect, or in the future may (so far as BUYER can now reasonably foresee) materially adversely affect, individually or in the aggregate, the ability of BUYER to consummate the transaction contemplated hereby that has not been set forth herein or heretofore communicated to SELLER in writing pursuant hereto.

3.   **Pre-Closing Covenants.**  SELLER and BUYER covenant and agree that from the date hereof through and including the Closing Date:

3.1   Best Efforts. Each party must use its best efforts to cause the Closing to occur.

3.2   Risk of Loss.  SELLER must deliver the Purchased Assets to BUYER at Closing with only ordinary wear and tear, provided that the inventory may be used and replaced in the manner that is customary in the ordinary course of business.  Risk of loss or damage to the Purchased Assets will be borne by SELLER until Closing.  Thereafter, BUYER will bear the risk of loss.

4.   **Closing Conditions.**

4.1   The obligation of the BUYER to consummate the transactions under this Agreement is subject to the satisfaction (or waiver in whole or in part by the Buyer in writing) at or prior to the Closing Date of each of the following conditions:

(a)   SELLER shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants contained in this Agreement to be performed and complied with by any of them prior to or at the Closing Date.  All representations and warranties of SELLER contained herein or in any document delivered pursuant hereto shall be true and correct when made and as of the Closing Date as though made on and as of the Closing Date.

(b)   BUYER shall have received a certificate executed by an officer of the Seller, dated the Closing Date, to the effect that the condition set forth in Section 4.1 (a) has been satisfied.

(c)     BUYER shall have been granted the right to operate an AAMCO franchise business at the Center.

(d)     The valid transfer of the Lease to BUYER shall have become effective with no changes to the current terms of the Lease (except for changes expressly approved in writing by BUYER in BUYER's sole discretion).

(e)     There shall have been, in the good faith judgment of BUYER, no material adverse change in the business, properties, prospects, operations, financial conditions, earnings, or contractual, business, or prospective relationship with third parties of the Center or the Business since the Measuring Date.

**5.     This Section is intentionally blank.**

**6.     Closing Date and Deliveries.**

6.1.    _Time and Place._  The closing must take place on the Closing Date at SELLER's place of business located at 201 Gibraltar Rd, Horsham, PA and, as necessary, via telephone conference(s), facsimile(s), electronic document transfers, and overnight deliveries between SELLER and BUYER, and BUYER's attorney (if any), or on/at another time/place as both parties agree.

6.2.    _This Section is intentionally blank._

6.3.    _Closing Date Deliveries of BUYER._  At the Closing Date, in addition to any other documents or items specifically required to be delivered pursuant to this Agreement, BUYER will, in form and substance reasonably satisfactory to SELLER and its counsel, deliver to SELLER:

(a)     Any remaining unpaid amounts of the Purchase Price, if any;

(b)     The Lease executed by BUYER; and

(c)     Such other instruments and documents as are:  (i) required by any other provisions of this Agreement by BUYER to SELLER or (ii) reasonably necessary, in the mutual opinion of SELLER and BUYER in connection with the consummation of the transaction contemplated hereby.

6.4     _Closing Date Deliveries of SELLER._  At the Closing Date, in addition to any other documents or items specifically required to be delivered pursuant to this Agreement, SELLER will, in form and substance reasonably satisfactory to BUYER deliver to BUYER:

(a)     Bill of Sale, in a form materially similar to that which is attached hereto as Schedule 6.4(a), executed by a duly authorized officer of SELLER; and

(b)     Such other instruments and documents as are: (i) required by any other provisions of this Agreement to be delivered on the Closing Date by SELLER to BUYER or (ii) reasonably necessary, in the mutual opinion of SELLER and BUYER or its counsel, in connection with the consummation of the transaction contemplated hereby.

**7.     Indemnification.**

7.1.     BUYER Claims.  Except as hereinafter set forth, SELLER agrees to indemnify and hold harmless BUYER and its successors and assigns and its respective members, managers, officers, directors, employees and agents, against, and in respect of, any and all damages, claims, losses, liabilities and expenses, including, without limitation, reasonable legal, accounting, and other expenses (whether incurred before, during, or after any trial or appellate proceedings relating thereto), which may arise out of any misrepresentation, material breach or material incorrectness of any representation, warranty, or covenant of the Seller or other breach or violation of this Agreement by SELLER.

7.2.     SELLER Claims.  Except as hereinafter set forth, BUYER must indemnify and hold harmless SELLER and its successors and assigns and, if any, its respective officers, directors, shareholders, employees and agents, against, and in respect of, any and all damages, claims, losses, liabilities and expenses (whether incurred before, during, or after any trial or appellate proceedings relating thereto), including, without limitation, reasonable legal, accounting and other expenses, which may arise out of any misrepresentation or other material breach or material violation of this Agreement by BUYER.

7.3.     Notice of Claim.  Upon obtaining knowledge thereof, the party to be indemnified (the "Indemnified Party") must promptly notify the party which is required to provide indemnification (the "Indemnifying Party") in writing of any damage, claim, loss, liability or expense which the Indemnified Party has determined has given rise or could give rise to a claim under this Section 7 (such written notice being hereinafter referred to as a "Notice of Claim"). A Notice of Claim must contain a detailed description of the nature and estimated amount of any such claim giving rise to a right of indemnification.  Upon receipt of written notice of any claim that is not based on a third party claim, the Indemnifying Party shall promptly pay such claim.

7.4.     Defense of Third Party Claims.  With respect to any claim or demand set forth in a Notice of Claim relating to a third party claim, the Indemnifying Party may elect, by written notice to the Indemnified Party within ten (10) calendar days after the date of the Notice of Claim and with counsel reasonably satisfactory to the Indemnified Party, to assume the defense of such claim at no expense to the Indemnified Party, and the Indemnified Party, at its expense, will have the right to participate in the defense of any such third party claim.  So long as the Indemnifying Party is defending, actively and in good faith, any such third party claim, the Indemnified Party must not settle or compromise such third party claim.  If the Indemnifying Party does not so elect to defend any such third party claim, the Indemnified Party will have no obligation to do so.  If the Indemnifying Party elects to assume the defense of such claim, the Indemnifying Party shall conduct such defense and the settlement thereof in a manner reasonably satisfactory and effective to fully protect the Indemnified Party and no compromise or settlement shall be agreed or made without the written consent of the Indemnified Party and without an unconditional release of the Indemnified Party.  The Indemnifying Party or the Indemnifying

Party's counsel shall keep the Indemnified Party advised as to the conduct of the defense or settlement and the Indemnified Party shall, at the sole cost and expense of the Indemnifying Party, fully cooperate with the Indemnifying Party in the defense of such claim. If the Indemnifying Party does not elect to assume the defense of any such third party claim or if it fails to conduct the defense or settlement actively and in good faith, the Indemnified Party shall not be obligated to do so, but may (upon written notice to the Indemnifying Party) engage independent counsel to assume the defense and may contest, pay, settle, or compromise any such claim on such terms and conditions as the Indemnified Party may reasonably determine and the fees and expenses of the Indemnified Party's counsel shall also constitute indemnifiable damages hereunder.

## 8.    Other Agreements.

8.1.    Further Cooperation.  BUYER, at the request of SELLER, and without further consideration, agrees to execute and deliver or to cause to be executed and delivered such other instruments as SELLER may reasonably request to more fully effectuate the transaction contemplated by this Agreement.

8.2    Confidentiality.

(a)    The parties hereto agree with respect to the terms and conditions of this Agreement, including, without limitation, the Purchase Price and all related details, as well as all information that is furnished or disclosed by the other parties (collectively, "Confidential Information", that: (i) such Confidential Information is confidential and/or proprietary to the furnishing/disclosing party and entitled to, and must receive, treatment as such by the receiving party; (ii) the receiving party must hold in confidence and not disclose nor use (except in respect of the transactions contemplated by this Agreement or in consultation with any legal or financial advisor) any such Confidential Information, treating such Confidential Information with the same degree of care and confidentiality as it accords its own confidential and proprietary information; and (iii) all such Confidential Information furnished to either party by the other, unless otherwise specified in writing, must remain the property of the furnishing/disclosing party, and in the event this Agreement is terminated, must be returned to it, together with any and all copies made thereof, upon request for such return by it. Without limiting the foregoing, BUYER specifically agrees that it is a direct violation of this Section to discuss any detail of this Agreement with any existing or potential AAMCO franchisee or non-essential ATI employees, either while attending AAMCO training at ATI's corporate office or elsewhere.

(b)    Each party hereto acknowledges that the remedy at law for any breach by either party of its obligations under Section 8.2 is inadequate and that the other party will be entitled to equitable remedies, including an injunction, in the event of breach of any other party. Without limiting the foregoing, BUYER agrees that if AAMCO reasonably determines that BUYER has breached Section 8.2(a) herein, SELLER may, in addition to other remedies SELLER may have, i) increase the interest rate charged on all notes due under this Agreement by two percent (2%) or ii) call such notes immediately due and payable. If SELLER wishes to exercise its rights under this subsection, it must notify BUYER in writing and include in such notice a detailed explanation of the facts it is basing its decision on. In addition, SELLER must

allow BUYER a fair opportunity to respond to SELLER's statements prior to commencing an action alleging that BUYER has breached Section 8.2(a) above.

8.3    Remedies.  Except for i) a breach of Section 7 herein, which such section shall survive the closing of this Agreement and ii) remedies specifically identified herein, which includes without limitation SELLER's obligation to cure any defect of title in the Purchase Assets as stated in Section 1.1(a), the sole and exclusive remedy for BUYER on any SELLER breach of this Agreement is the termination of this Agreement and the full return of all sums paid to SELLER hereunder.

8.4    Debts of the SELLER.  SELLER agrees to pay all debts and liabilities which accrue prior to the Closing Date that are attributable to SELLER in the operation of the Center.

8.5    Use of Contact Numbers.  SELLER agrees that BUYER has the right to utilize any telephone lines, listings, or numbers that SELLER has control of at the Center as of the date of this Agreement, provided BUYER pays accordingly for same; however, BUYER acknowledges that SELLER is not obligated to transfer ownership of any such lines, listings, or numbers as American Driveline Communications Corp. retains control of these items per the AAMCO franchise agreement.

8.6    Business Operations.  From and after the Closing Date, BUYER will be fully responsible for the payment and permanent handling of utilities, salaries, and all other items of expense thereafter incurred in the normal business operations. BUYER agrees to indemnify and hold the SELLER harmless from liability for any and all such obligations.

8.7    Execution and Delivery of Franchise Documents.  BUYER agrees to execute, on or before the Closing Date, standard AAMCO applications and forms as well as standard AAMCO franchise agreements along with all other documents required to permit BUYER to operate the Center under the trademark and trade name "AAMCO." Failure of BUYER to fully execute these agreements and documents will make this Agreement terminable at SELLER's sole discretion.

8.8    Customer Complaints and Warranty Claims.  BUYER agrees to honor all customer complaints, come backs, warranty claims, and refunds due to warranties issued or cancelled service agreements that are resulting from work originally performed at the Center prior to the Closing Date, and agrees to sign a reasonable amendment to the AAMCO franchise agreements indicating so. BUYER also agrees to take whatever steps are reasonably necessary, including but not limited to, additional work on customers' transmissions in order to satisfy any such customer.

8.9    Yellow Pages.  BUYER agrees to pay the remainder of any preauthorized Yellow Page, or similar, advertising Contract(s) that is/are in effect as of the Closing Date, and further agrees to sign paperwork agreeing to take on such obligation(s).

8.10   Franchise Training.  BUYER must attend, and successfully complete, the training course conducted by AAMCO at its Horsham, PA office starting on October 10, 2011, and will pay for all travel, hotel, meals, and related expenses regarding such training course.

8.11    Work in Process.

(a)    SELLER will receive payment for all work that has been completed prior to the Closing Date; and

(b)    BUYER must complete, and receive payment for, all work that has not been completed prior to the Closing Date.

8.12.    Repairs of Leased Premises. SELLER hereby agrees to be responsible for (and pay for) all repairs over $500, in the aggregate, to the Leased premises at which the Center is located that would otherwise be the responsibility of the tenant under the Lease to the extent such repairs arise prior to the end of six months following the Closing Date.

## 9.    Termination.

9.1.    Rights to Terminate. Except as otherwise stated herein, this Agreement may only be terminated prior to the Closing Date by (a) mutual written consent of SELLER and BUYER; or (b) BUYER if one or more of the conditions to BUYER's obligations specified in Section 4.1 shall not have been satisfied. Upon any termination of this Agreement pursuant to this Section 9.1, SELLER shall promptly pay BUYER an amount equal to the sums paid by BUYER to SELLER, and the receipt of such amount shall be BUYER's sole and exclusive remedy.

## 10.    General Provisions.

10.1.    Notices. All notices or other communications required or permitted by this Agreement must be in writing and will be deemed to have been duly received: (a) if given by facsimile, when transmitted and the appropriate telephonic confirmation received if transmitted on a business day and during normal business hours of the recipient, and otherwise on the next business day following transmission; (b) if given by certified mail, return receipt requested, postage prepaid, three business days after being deposited in the U.S. mails; and (c) if given by courier or other means, when received or personally delivered, and, in any such case, addressed as follows:

If to SELLER: American Driveline Centers, Inc.
                         201 Gibraltar Road
                         Horsham, PA 19044
                         Attention: Matthew Wright
If to BUYER:    Gerald H. Hansen
                         1410 Grandview Boulevard
                         Kissimmee, FL 34744

or to such other addresses as may be specified by any such Person to the other Person, pursuant to notice given by such Person in accordance with the provisions of this Section 10.

10.2.   Amendments.   Subject to the provisions of applicable legal requirements, this Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

10.3.   Extension; Waiver.   Without limiting the generality or effect of the preceding sentence, no delay in exercising any right under this Agreement will constitute a waiver of such right, and no waiver of any breach or default will be deemed a waiver of any other breach or default of the same or any other provision in this Agreement.

10.4.   Transfer Taxes.   All Transfer Taxes, if any, due under the laws of any state, any local government authority, or the federal government of the United States, in connection with the purchase and sale of the Purchased Assets, must be paid by BUYER.

10.5.   Counterparts.   This Agreement may be executed in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

10.6.   Governing Law.   This Agreement and any related document or instrument is governed by the laws of the Commonwealth of Pennsylvania.   With respect to any legal proceedings arising out of or connected in any way to this Agreement, BUYER and SELLER consent to the jurisdiction and venue of any court of general jurisdiction of Montgomery County, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania, and any legal proceedings arising out of this Agreement must be brought only in such courts and not in any other courts. The parties further agree that the mailing by certified or registered mail, return receipt requested or by an overnight carrier service that provides a receipt to the address provided herein of any process constitutes lawful and valid process.

10.7.   Interpretation.   The headings contained in this Agreement are for convenience only and are not to be deemed a part of this Agreement. When a reference is made in this Agreement to Exhibits or Schedules, such reference is to an Exhibit or Schedule to this Agreement unless otherwise indicated.

10.8.   Entire Agreement.   This Agreement, taken together with the Schedules and Exhibits hereto, constitutes and incorporates the entire agreement among the parties with respect to the subject matter hereof, and may not be modified or amended except by an instrument in writing signed by the parties hereto.

10.9.   Successors.   This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.

10.10.   Assignment.   Neither this Agreement nor any of the rights, interests, or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the parties hereto without the prior written consent of the other party hereto, and any such assignment without such prior written consent is null and void, except that BUYER may assign this Agreement to a wholly owned corporation provided BUYER executes the proper documentation to effectuate such assignment as well as any amendment to this Agreement that addresses Gerald H. Hansen's obligations to individually sign

the AAMCO franchise agreement and related franchise documentation. This Agreement is binding upon, inures to the benefit of, and is enforceable by, the parties hereto and their respective successors and assigns.

10.11. Severability. If any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void, or unenforceable, the remainder of this Agreement will continue in full force and effect and will be interpreted so as to reasonably effect the intent of the parties hereto. The parties hereto must use all reasonable efforts to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business, and other purposes of such void or unenforceable provision.

IN WITNESS WHEREOF, BUYER and SELLER have executed this Agreement as of the date first written above.

AMERICAN DRIVELINE CENTERS, INC.

By: _____     _____
    Michael Sumsky, Executive VP-CFO        Gerald H. Hansen, individual

Schedule 1.1(a)

| | | | | |
|---|---|---|---|---|
| Twin Post Lifts various | 10 | Dirty Rag Receptacle | 1 |
| Air Stations - Shop Air/Elect on lifts | 10 | Drum Dolly - 55gal | 1 |
| Air Compressor - 5hp/ 80 gal/ 16.5 cfm@175psi | 1 | Trans  Cart / w  parts basket - 30Lx22Dx34H | 2 |
| Air Compressor Vibration Isolators | 1 | Bench Vise -  Steel - 6" jaw | 1 |
| Power Pusher  HD | 1 | Trans Holding Fixtures – UNIV Rear Whl Drive | 1 |
| Cleaning Machine (cooker) | 1 | Trans Holding Fixtures – UNIV Front Whl Drive | 1 |
| System One Parts Cleaner / Recycler | 1 | Trans Holding Fixtures - GM | 1 |
| Small Parts Cleaner - 12 gal | 1 | Barrel Pump - Rotary Hand | 1 |
| Battery Charging System Tester | 1 | Bench Grinder | 1 |
| Battery Charger - Power Supply | 1 | Grinder Stand | 1 |
| Snap-on scanner/ Import  Kit /MODIS | 1 | 5 Qt Oil Dispenser | 2 |
| AC Recovery unit system  - Best Value (Opt avail) | 1 | 2pc Funnel | 2 |
| Refrigerant Identifier System - Pass/Fail | 1 | Tank Funnel | 1 |
| Smoke machine Redline / evap / kit | 1 | Drain Pan | 1 |
| Radiator Flush Unit | 1 | High Rise Drain - self evac w/square funnel - 24gal | 1 |
| Trans Flush Exchanger | 1 | High Rise Drain Can | 1 |
| Turbo Cooling Line Flusher DLX | 1 | High Rise Drain Can Funnel | 1 |
| Oil Storage Tank 275gal ATF single wall - Check Req | 1 | Engine Hanger | 1 |
| Waste Oil Storage Tank 275g single wall - Check Req | 3 | Van Engine Hanger | 1 |
| Trans Work Benches - Metal  72Lx36Dx34H | 5 | Arbor Press 3 ton | 1 |
| Mech Work Benches - welded steel  72Lx36Dx34H | 6 | Arbor Press Stand | 1 |
| Waste Oil Heater - 300,000 BTU | 1 | Hydraulic Press w/ Separator - 20 ton | 1 |
| Trans. Jack  1/2 ton air/hydraulic | 2 | Suspension Strut Compressor | 1 |
| Jack Adaptor for Trans Jack | 1 | Torch  Set - Oxy/Acet Kit | 1 |
| Floor Jack  2 1/2 ton | 3 | Front Axle Tool | 1 |
| High Stands  74"  1 ton capacity ea | 4 | Trans Snap Ring Remover (foot press) | 1 |
| Jack Stands  6 ton | 2 | Foot Press Adapter - Adjustable | 1 |
| Special Tool pkg for Trans Builder | 1 | Bushing Drivers - Master Set 26pc | 1 |
| Air Hoses / Coiled Builders Room | 2 | First Aid Safety Kit - OSHA | 1 |
| Air Hoses 3/8x25' | 6 | Eye Wash Station - OSHA | 1 |
| Air Coupler Package | 1 | Spill Response Kit - EPA | 1 |
| Tire Inflator w/ Gauge | 1 | Spill Response Pads 200 - EPA | 1 |
| Drop Lights - Fluorescent on 40' reel | 5 | Locking Storage Cabinet | 1 |
| Safety Goggles | 2 | HD Storage System   60x20  9 trans / unit | 2 |
| | | Parts Shelves  36x12 Closed  400lb | 4 |

| | | | |
|---|---|---|---|
| AAMCO Technical Reference Manuals Set | 1 | AAMCO Six panel plastic holder | 1 |
| AAMCO Direct Tech PRO w/ ALLDATA | 1 | AAMCO Warranty books  qty 50 | 1 |
| AAMCO FOCUS GOLD Shop Management Software | 1 | AAMCO Warranty envelopes qty 50 | 1 |
| AAMCO FOCUS GOLD SUPPORT - Annual | 1 | AAMCO Telephone Procedure Pad | 1 |
| Phone System  3 line 3 station | 1 | AAMCO Floor mats Pk250 | 1 |
| Cordless Phone  3 line | 1 | AAMCO Hang tags Pk1000 | 1 |
| Digital On Hold  Message System | 1 | AAMCO Clip Board | 4 |
| AAMCO Counter Pod - Triangular | 1 | AAMCO R/O Racks | 3 |
| AAMCO CSM Office Desk | 2 | AAMCO Workflow Dry Erase Board | 1 |
| AAMCO Cube End Table | 3 | AAMCO Logo Patches | 20 |
| AAMCO Chair, Black Arm Upholstered | 7 | AAMCO Supplies Pkg (estimate) | 1 |
| Owners Office Desk | 1 | AAMCO Clock | 1 |
| Owners Office Chair | 1 | AAMCO Automatic Trans Policy Poster | 1 |
| CSM / Shop Tech Office Chair | 1 | AAMCO Manual Trans Policy Poster | 1 |
| Shop Tech Desk | 1 | AAMCO Sprag Rotation Chart-Domestic | 1 |
| Towel Dispenser | 2 | AAMCO Sprag Rotation Chart-Import | 1 |
| File Cabinet - 4 drawer  w/ Lock - Letter | 1 | AAMCO Signs Building | 2 |
| File Cabinet - 4 drawer - w/ Lock - Legal | 1 | AAMCO Signs Pole Sign | 1 |
| Office Waste Containers | 3 | AAMCO Signs Other | 1 |
| AAMCO Unified Repair Orders qty 1000 | 2 | OTHER EQUIPMENT | |
| AAMCO Customer Reception Forms | 1 | shop fans | 2 |
| AAMCO Outside Sales- Hard Account Folder | 50 | Computer | 1 |
| AAMCO Outside Sales- Trans Guide | 50 | Touch-screen computer | 1 |
| AAMCO Outside Sales- Soft Account Tri-Fold Pk 50 | 1 | AAMCO Focus Gold and (when available) the new POS software upgrade | 1 |
| AAMCO Outside Sales- TransScan Coupon Book | 20 | | |
| AAMCO TCC - TransScan Form  Pk100 | 1 | | |
| AAMCO TCC - TransScan Brochure Pk50 | 1 | | |
| AAMCO TCC - Protect Check Brochure Pk50 | 1 | | |
| AAMCO TCC - Service Plus Brochure Pk50 | 1 | | |
| AAMCO TCC - Warranty Brochure Pk50 | 1 | | |
| AAMCO TCC - Fluid Change Brochure Pk50 | 1 | | |
| AAMCO TCC-  Car Delivery Book Pk50 | 1 | | |
| AAMCO TCC - Free TransScan Coupon Pk50 | 1 | | |
| AAMCO TCC - $100 off Trans Rebuild Pk50 | 1 | | |
| AAMCO TCC - Oil Change Stickers Rf100 | 1 | | |
| AAMCO TCC - Key Tags Pk500 | 1 | | |

Schedule 2.1(d)

Appendix A

## LEASE

THIS LEASE, made this 9th day of May 2011 by and between Zary G. Luke ("Landlord") and American Driveline Centers, Inc.

### FACTUAL RECITATIONS:

I. Landlord is the owner of the property and improvements located at 8844 Kingston Pike, Knoxville, TN 37923 ("Premises").

II. American Driveline Centers, Inc. is an affiliate of AAMCO Transmissions, Inc., a franchisor of retail transmission and general automotive repair facilities.

III. American Driveline Centers, Inc. desires to temporarily lease the Premises in order to operate an AAMCO Transmissions Center at the Premises ("Center") with the intention of transferring complete ownership of such Center to a third party within two years from the date of commencement. Therefore, while American Driveline Centers, Inc. intends to pay monthly rents to Landlord for the time it occupies the Premises, it wants at all times to maintain the option to either: i) terminate this Lease with ninety (90) days written notice to Landlord or ii) assign all rights and obligations under this Lease to a third-party purchaser of the Center.

IV. Landlord desires to lease the Premises to American Driveline Centers, Inc. per the same conditions listed in Section III above, as such conditions are further defined below.

### AGREEMENT:

In consideration of the covenants, promises and conditions contained herein, the parties, intending to be legally bound, hereby agree as follows:

1. **TENANT:**   As used herein, the term "Tenant" means "American Driveline Centers, Inc." unless or until such time as American Driveline Centers, Inc. assigns this Lease to a third party per the terms of Section 3(ii) and Appendix A below, at which time such assignee, as identified in Appendix A, will, from the effective date of the assignment forward, be the Tenant under this Lease.

2. **PREMISES:**   Landlord leases to Tenant, and Tenant leases from Landlord, the following property located at 8844 Kingston Pike, Knoxville, TN 37923 ("Premises") which Landlord warrants is properly zoned for use as a transmission and general automotive repair retail center:

3. **TERM:**   The Term of the Lease commences on May 31, 2011 ("Commencement Date"); however, no rent is due until June 1, 2011. The duration of the term is as follows:

   a. If American Driveline Centers, Inc. is the Tenant under this Lease, then:

      i. The Term of the Lease will be for two years with American Driveline Centers, Inc. having the exclusive right to terminate this Lease upon ninety (90) days written notice to Landlord; and upon the expiration of such ninety (90) day period, will have no further rights or obligations under this Lease except for any unpaid obligations or liabilities that have accrued prior to the effective date of said termination; and

Schedule 2.1(d)

    ii.  American Driveline Centers, Inc. has the exclusive right to assign this Lease to a third party, provided that such party is approved as an AAMCO franchisee, by having such third party execute Appendix A hereto; and upon such assignment, American Driveline Centers, Inc. will have no further rights or obligations under this Lease except for any unpaid obligations or liabilities that have accrued prior to the effective date of said assignment. Landlord approval of the third party assignee is not required. However, if third party assignee is an incorporated entity, then the Individual(s) signing the AAMCO franchise agreement to become an AAMCO franchisee at the Center (who must also own a majority interest in the entity taking assignment of this Lease) must execute Appendix B hereto.

  b.  If American Driveline Centers, Inc. assigns this Lease to a third party per Section 3(a)(ii) above and Appendix A below, then:

    i. The initial Term of the Lease for such assignee/Tenant will be for five (5) years starting from the effective date of assignment from American Driveline Centers, Inc.; and

    ii.  Such assignee/Tenant will have the right and option to extend this Lease upon the expiration of the initial five-year Term for two (2) additional five-year terms; both extensions, if elected, will be under the same terms and conditions herein, except that the Base Rent for each year of both extension will be increased by 2% over the previous year's Base Rent.

        I.  Exercising the option to extend this Lease for an additional five-year term pursuant to Section 3(b)(ii) above must be done in writing to Landlord no later than 90 days prior to the end of the current Term.

4.  **RENT:**        The Base Rent for the initial Term of this Lease is as follows:

  a.  If American Driveline Centers, Inc. is the Tenant under this Lease, then the Base Rent is $5,525 per month with Tenant being responsible for payment of taxes and insurance as further described in Section 4(c) below.

  b.  If American Driveline Centers, Inc. assigns this Lease to a third party per Section 3(a)(ii) above and Appendix A below, then:

    i. The Base Rent for the first year of the initial Term is $5,525 per month with the Base Rent for years two through five of the initial Term each being equal to the proceeding year's Base Rent plus 2%.

  c.  Regardless of the Tenant, Additional Rent is due monthly in an amount equal to One Hundred Fifty Dollars ($150) per month for insurance on the Premises and 1/12 of the annual cost of real estate taxes for the Premises.

        I.  Payments of Additional Rent must be made monthly and based on known costs for the current year;

Schedule 2.1(d)

II.  Landlord must, within 30 days of the end of each lease or tax year (provided whichever year-end is chosen in the first year of the term that it remains consistent over the Term of the Lease), provide Tenant with copies of actual invoices for all real estate taxes for that year along with a reconciliation of amounts collected from Tenant and expenditures paid by Landlord; and i) any "shortfall" must be paid by Tenant within 60 days of delivery of such reconciliation and ii) any "overage" must be deducted from Tenant's next month's Additional Rent payment and continue to be deducted until the total overage is credited in full to Tenant; provided however, that if such overage occurs in the final year of a Lease term, and notice of renewal has not been tendered, then such overage must be paid directly to Tenant within 30 days of the end of such term.

d.  Any Term starting or ending under this Lease includes Base Rent and Additional Rent that is due on the first day of each calendar month, and will be prorated as necessary for any partial month/term in question.

5.  SECURITY DEPOSIT:  A Security Deposit must be paid as follows:

a.  There is no Security Deposit due while American Driveline Centers, Inc. is the Tenant hereunder.

b.  Immediately upon assignment of this Lease to a third party per Section 3(a)(ii) above and Appendix A below, a Security Deposit of $5,000 must be paid by such assignee/Tenant to Landlord as security for the performance of Tenant's obligations under this Lease. This deposit is not considered prepaid rent. The Security Deposit must be returned within Thirty (30) days of Tenant's vacating the Premises, in a check payable to Tenant. The full Security Deposit will be returned minus: 1) any unpaid balances in Tenant's account and 2) the cost of repairs to the Premises beyond normal wear and tear (such damages are to be itemized).

6.  USE:    Tenant may only use the Premises for the operation of an AAMCO Transmission Center, which includes transmission and general automotive service and repair.

7.  MAINTENANCE BY TENANT:

a.  During such time as American Driveline Centers, Inc., is the Tenant hereunder, the following applies:

   i. American Driveline Centers, Inc. will only be responsible for damage to the air conditioning, heating, ventilation, aboveground plumbing, wiring, fixtures, and equipment located on the Premises that is caused by its gross negligence, and it will not be responsible for the regular maintenance, general repair, or replacement of these items, or any aspect of the Premises, so long as it uses these items, and the Premises, in a reasonable and customary manner.

   ii. Landlord is obligated to make all repairs to the Premises that are not the responsibility of American Driveline Centers, Inc. pursuant to Section 7(a)(i) above, and do so in a reasonably expedient timeframe as not to allow such disrepair to disrupt the operations of the AAMCO Transmissions Center.

   iii. If, at the one year anniversary on the Commencement Date, American Driveline Centers, Inc. is still the Tenant under this Lease, then American Driveline Centers, Inc. will, from that point forward, be obligated to follow the provisions for maintenance specified in Section 7(b) below.

Schedule 2.1(d)

b.   If American Driveline Centers, Inc. assigns this Lease to a third party per Section 3(a)(ii) above and Appendix A below, then the following applies:

i. Landlord must keep and maintain in good condition the roof, exterior walls, foundation, underground and behind wall plumbing, and all paved areas.

ii.  Tenant must is obligated to make all repairs to the Premises that are not the responsibility of Landlord pursuant to Section 7(b)(i) above.

8.   CONDITION OF PREMISES AT COMMENCEMENT OF LEASE TERM:  Landlord warrants that all existing air conditioning, heating, ventilation, above and below ground plumbing, wiring, fixtures, equipment, appurtenances, roof, structure and exterior walls will be in good operating order and commercially reasonable repair when Tenant takes possession. Landlord also warrants and represents that the flooring is capable of supporting the installation of above ground lifts. If non-compliance with said warranty exists as of the commencement date, Landlord must, except as otherwise provided in this Lease, promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, rectify the same at Landlord's expense.

9.   COMPLIANCE WITH BUILDING CODE:  Landlord warrants that any improvements (other than those constructed by Tenant) on or in the Premises will comply with all applicable covenants or restrictions of record and applicable building codes, regulations and ordinances in effect on the commencement date. Landlord further warrants to Tenant that Landlord has no knowledge of any claim having been made by any governmental agency that a violation or violations of applicable building codes, regulations, or ordinances exist with regard to the Premises as of the commencement date. If the Premises do not comply with said warranties, Landlord must, except as otherwise provided in this Lease, promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, take such action, at Landlord's expense, as may be reasonable or appropriate to rectify the non-compliance.

10.  CONDITION OF PREMISES AT END OF LEASE TERM:  Tenant must deliver up the Premises at the end of the Lease term in as good condition as at the time of commencement of the Lease term, except for the ordinary wear and tear and damage by fire or other casualties or causes beyond Tenant's control.

11.  UTILITIES:  Tenant must pay for all utility services, including water, gas, oil, and electric used by Tenant in connection with the operation of its business on the Premises.

12.  COMPLIANCE WITH LAW:  Tenant must abide by all valid laws, rules, and regulations of governmental authorities having jurisdiction over the operation of the type of business conducted on the Premises by Tenant.

13.  INSURANCE:  The following insurance coverage relating to the Premises are required:

Schedule 2.1(d)

a.  GARAGE LIABILITY INSURANCE:  During the Lease term, Tenant must maintain an insurance policy insuring Tenant, Landlord and American Driveline Centers, Inc. and AAMCO Transmissions, Inc. against liability associated with events occurring on and off the Premises with limits of coverage of not less than $300,000.00 for property damage loss from any one occurrence and not less than $1,000,000.00 for personal injury to any one person from any one occurrence. Except when American Driveline Centers, Inc. is Tenant hereunder, Tenant must furnish Landlord with a certificate evidencing such insurance coverage as well as a 30 day notice of cancellation of policy.

b.  GARAGE KEEPERS' LIABILITY INSURANCE:  Except when American Driveline Centers, Inc. is Tenant hereunder, Tenant must maintain an insurance policy insuring Tenant, Landlord and AAMCO Transmissions, Inc. against liability for damage to and theft of customers' vehicles in the care, custody and control of Tenant's AAMCO Transmission Center. The limit of coverage must not be less than $100,000.00.

c.  BUILDING CONTENT INSURANCE:  Except when American Driveline Centers, Inc. is Tenant hereunder, Tenant must insure the equipment, supplies furniture, and fixtures on the Premises, as well as any improvements to the Premises added at Tenant's expense, against all risks of physical damage, with not less than an 80% replacement cost endorsement.

d.  CASUALTY INSURANCE:  Landlord must maintain fire and all risk property and casualty insurance on the building with replacement cost endorsement.

Any insurance carried by Landlord or Tenant must be carried for the benefit of Tenant to the extent of loss or damages to improvements or other property owned by Tenant and for the benefit of Landlord to the extent of loss or damage to improvements or other property owned by Landlord.

14. WAIVER OF SUBROGATION

a.  LANDLORD'S WAIVER:  Landlord hereby releases Tenant, but only to the extent of Landlord's insurance coverage and only to the extent payment is actually received under such coverage by Landlord, from any liability for loss or damage covered by any insurance policies which Landlord carries with respect to the Premises regardless of whether such insurance is required by this Lease and even if the insured peril is brought about by the default, negligence or other action of Tenant or Tenant's agents or employees, provided this release is in effect only with respect to an insured loss only so long as Landlord's policy is applicable to such loss. Landlord does not waive, and hereby reserves the right to secure compensation from Tenant for any uninsured loss, any amount not paid because of deductibles, and other amounts not paid for any reason whatsoever.

b.  TENANT'S WAIVER:  Tenant hereby releases Landlord, but only to the extent of Tenant's insurance coverage and only to the extent payment is actually received under such coverage by Tenant, from any liability for loss or damage covered by any insurance policies which Tenant carries with respect to the Premises regardless of whether such insurance is required by this Lease and even if the insured peril is brought about by the default, negligence or other action of Landlord or Landlord's agents, or employees, provided this release is in effect only with respect to an insured loss only so long as Tenant's policy applicable to such loss contains a clause to the effect that this release will not affect the right of the Tenant to recover under such policy. Tenant does not waive, and hereby reserves the right to secure compensation from Landlord for any uninsured loss, any waiver, and hereby reserves the right to secure compensation from Landlord for any reason whatsoever.

*3HL*

Schedule 2.1(d)

15. FIXTURES:  All trade fixtures, machinery, equipment, cabinets, counters, and shelving which are installed or placed in the Premises by Tenant will remain the property of Tenant, and Tenant will have the right to remove the same at any time provided it is not in default in any of the agreements.

16. ASSIGNMENT AND SUBLETTING:  American Driveline Centers, Inc. may assign this Lease pursuant to Section 3(a)(ii) above and Appendix A below; however, any other Tenant hereunder may not assign this Lease or sublet all or any portion of the Premises without Landlord's prior written consent, which will not be unreasonably withheld or delayed.

17. QUIET ENJOYMENT:  Landlord covenants that if Tenant pays the rentals and performs the agreements hereunder, Landlord will protect and defend against any interference with the Tenant's use and enjoyment of the Premises during the term and any extension of this Lease.

18. SUBORDINATION:  Tenant agrees, upon request of Landlord, to subordinate its leasehold interest to the lien of any bona fide mortgage that may be procured by Landlord on the Premises. This agreement to subordinate is conditioned on the mortgage holder permitting Tenant to remain in possession of the Premises pursuant to the term of this Lease and to apply rental payments against the debt secured by said mortgage in the event of default on the part of the Landlord, as long as Tenant complies with and performs all of the convenants and undertakings under this Lease.

19. DAMAGES TO PREMISES:  In the event the Premises is damaged by fire or other casualty during the term of this Lease, Tenant must give immediate notice thereof in writing to the Landlord.

    a.  PARTIAL DAMAGE:  If any part of the Premises is damaged, but not to such an extent as to render the Premises wholly un-leasable, the rent will abate proportionately from the date of such notice to the date that the Premises are restored. Landlord agrees to expeditiously commence the repair of the Premises at his own expense after receipt of such notice and to complete such repairs with due diligence. In the event that the partial damage is sufficient to impair Tenant's business and the damage has not been repaired within forty-five (45) days following receipt of notice by Landlord, Tenant, at its option and provided that the damage was not caused by Tenant's negligence, may terminate the Lease following reasonable notice to Landlord.

    b.  TOTAL DAMAGE:  If the damage to the Premises is so extensive as to render the Premises wholly un-leasable, the rent will cease until the Premises are restored to a leasable condition, at which time the rent will begin to run and be payable as before the damage. In the event the Premises is rendered un-leasable, Tenant, at its option and provided that the damage was not caused by Tenant's negligence, may terminate the Lease following reasonable notification to Landlord. The Landlord will not be obligated to reconstruct the building, but may elect not to do so and upon reasonable notification to Tenant of this election will terminate this Lease.

20. ENVIRONMENTAL MATTERS:

    a.  Landlord hereby indemnifies, defends, and holds harmless American Driveline Centers, Inc. and its assigns that have not taken assignment of this Lease pursuant to Appendix A hereunder, heirs, executors, affiliates, predecessors or successors from any and all claims, actions, demands, losses, costs, expenses, liabilities (joint & several), penalties, and/or damages, including counsel fees (hereinafter "Damages") arising from, or in any way related to, the existence of any material or other environmental condition in, on or under the Premises, unless the presence of such material or environmental condition can be shown to be a direct result of American Driveline Centers, Inc.'s gross negligence.

Schedule 2.1(d)

b. For any Tenant other than American Driveline Centers, Inc., Landlord hereby indemnifies, defends, and holds harmless Tenant and its assigns, heirs, executors, predecessors or successors from any and all claims, actions, demands, losses, costs, expenses, liabilities (joint & several), penalties, and/or damages, including counsel fees (hereinafter "Damages") arising from, or in any way related to, the existence of any material or other environmental condition in, on or under the Premises, if the material or condition is shown to be unrelated to Tenant's occupation of the Premises. Damages include, but are not limited to, 1) the cost of an investigation related to any material or other environmental condition in, on, or under the Premises and 2) the cost of avoiding or apposing the imposition of such an investigation.

c. For any Tenant other than American Driveline, Inc., Tenant hereby indemnifies, defends, and holds harmless Landlord and its assigns, heirs, executors, predecessors or successors from any and all claims, actions, demands, losses, costs, expenses, liabilities (joint & several), penalties, and/ or damages, including counsel fees (hereinafter "Damages") arising from, or in any way related to, the existence of any material or other environmental condition in, on or under the Premises, if the material or condition is shown to be isolated to Tenant's occupation of the Premises. Damages include, but are not limited to, 1) the cost of an investigation related to any material or other environmental condition in, on or under the Premises and 2) the cost of avoiding or apposing the imposition of such an investigation.

21. NOTICE: All rent payable and notices required to be given under this Lease to Landlord must be paid and given at or mailed to the Landlord's address listed below, or at such other place as Landlord may from time to time specify by written note to Tenant. All notices given under this Lease to Tenant must be given at or mailed to the Tenant's address listed below or at such other place, as Tenant may specify by written notice to Landlord. Any such notice properly mailed by United States Registered or Certified Mail, postage and fee prepaid, will be deemed delivered when mailed. A copy of all notices must be sent to AAMCO Transmissions, Inc. at 201 Gibraltar Road, Suite 150, Horsham, Pennsylvania 19044. Address for payment and notices:

LANDLORD: 122 Westview Lane, Oakridge, TN 37830    TENANT: at the Premises

22. CROSS INDEMNIFICATION: Tenant will indemnify, defend and hold Landlord harmless from and against any and all claims against Landlord made by or on behalf of any individual or entity for any injury or damage arising from Tenant's operation of the Premises if the injury or damage resulted from 1) any negligent, reckless or intentional conduct by Tenant or its agents or 2) Tenant's violation of any provision of this Lease. Tenant, upon notice from Landlord, must defend Landlord against any such claim in a manner reasonably satisfactory to Landlord.

a. Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims against Tenant made by or on behalf of any individual or entity for any injury or damage arising from Landlord's conduct on the Premises if the injury or damage resulted from 1) any negligent, reckless or intentional conduct by Landlord or its agents or 2) Landlord's violation of any provision of this Lease. Landlord, upon notice from Tenant, must defend Tenant against any such claim in a manner reasonably satisfactory to Tenant.

23. SIGNS: Landlord hereby grants Tenant the right to install AAMCO signs subject only to local laws and ordinances.

24. INSPECTION: Landlord may enter onto the Premises during normal business hours, after reasonable notice to Tenant, for the purpose of inspecting the Premises.

Schedule 2.1(d)

25. CONDEMNATION: In the event that Premises or any part of the Premises is taken or condemned for a public or quasi-public use, this Lease will, as to the part so taken, terminate as of the date title will vest in the condemnor, and rent will, as to the part so taken, terminate as of the date title will vest in the condemnor, and rent will abate in proportion to the square footage of the Premises taken or condemned or will cease if the entire Premises is taken or condemned. In either event, Tenant waives all claims against Landlord by reason of the complete or partial taking of the Premises.

26. DELAYS (FORCE MAJEURE): Whenever a period of time is provided, Landlord or Tenant will not be liable for any delay for reasons beyond Landlord's or Tenant's reasonable control and performance will be extended for a period equivalent to the period of such delay.

27. TIME IS OF THE ESSENCE: Except for fore majeure delays, time is of the essence with respect to the performance of every provision of this Lease.

28. INTEGRATION: This Lease, including the AAMCO Lease Rider and Appendix A attached hereto, constitutes the entire contract between the parties. There are not other understandings, representations, or warranties, written or oral, relating to the subject matter of this Lease, which will obligate any of the parties.

29. INVALIDATION: The provisions of this Lease are governed by (and will be enforced in accordance with) Tennessee law. Should any clause or provision of this Lease be invalid, void, or voidable for any reason, such invalid, void, or voidable clause or provision will not affect the whole of this instrument, but the balance of the provisions will remain in full force and effect.

30. SUCCESSORS AND ASSIGNS: The provisions of this Lease will bind and inure to the benefit of each of the parties and their respective successors and assigns.

31. WAIVER: Failure of either Tenant or Landlord to exercise any of their respective rights under this Lease upon the default, nonperformance or defective performance by the other party of a provision contained in the Lease will not be construed as a waiver of that or any subsequent default, nonperformance or defective performance.

32. MODIFICATION OR AMENDMENT: No waiver, release, modification, or amendment of any of the terms, conditions, or provisions of this Lease will be valid or effective unless in writing, duly executed by Landlord and Tenant and approved by AAMCO Transmissions, Inc.

33. COUNTERPARTS: This Lease may be executed in counterparts, each of which constitutes an original document, in which event this Lease will have the same force and effect as if all of the parties has signed a single signature page.

34. EXCLUSIVE USE: Landlord may not allow a competitive use (i.e. any business in the practice of, or practicing, transmission or general automotive service or repair) on any adjacent property owned by Landlord.

35. ALTERATIONS AND IMPROVEMENTS: Any renovations, improvements, or additions ("Alterations") by Tenant must be pre-authorized by Landlord, which approval must not be unreasonably withheld or delayed. Landlord hereby consents to renovations, improvements, or additions by Tenant which Tenant reasonably demonstrates are necessary to its business operation on the Premises.

Schedule 2.1(d)

36. <u>ASSIGNMENT</u>:  Any assignment hereunder must be to an individual unless otherwise approved in writing by Landlord.

37. <u>DEFAULTS</u>:
    a.   The occurrence of any one or more of the following events will constitute a material default and breach of this Lease by Tenant:

        i. The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder, within ten (10) days as and when due. In the event that Landlord serves Tenant with a Notice to Pay Rent or Quit pursuant to applicable Unlawful Detainee statutes, such Notice to Pay Rent or Quit will also constitute the notice required by this subparagraph.

        ii.  The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant, other than described in Paragraph (a) above, where such failure continues for a period of ten (10) days after receipt by Tenant of written notice thereof from Landlord describing the nature of the default, provided, however, that if the nature of Tenant's default is such that more than ten (10) days are reasonably required for its cure, then Tenant will not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently prosecutes such cure to completion.

38. <u>REMEDIES ON DEFAULT</u>:

    a.   Upon Tenant's continued monetary default after ten (10) days written notice of such default, or Tenant's continued default under and other provision of this Lease after thirty (30) days written notice of such default, to the default, Landlord may immediately terminate and re-enter and possess the Premises without waiving and other remedy or remedies available to it under Tennessee law. Landlord may exercise any and all remedies available pursuant to applicable law. If litigation is commenced by Landlord over an allegation of default by Tenant, the prevailing party will be entitled to reasonable attorney's fees.

    b.   Late Charges:  Tenant hereby acknowledges that the late payment by Tenant to Landlord or rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any other sum due from Tenant is not received by Landlord or Landlord's designee within five (5) days of written notice by Landlord that such amount is due, then, Tenant must pay to Landlord a late charge equal to five percent (5%) of such overdue amount.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.  Acceptance of such late charge by Landlord will in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

Schedule 2.1(d)

c.   Interest on Past Due Obligations:  Except as previously herein provided, any amount due to Landlord, not paid when due, will bear interest at the maximum rate of 18% interest per annum or then allowable by law from the date due.  Payment of such interest will not excuse or cure any default by Tenant under this Lease, provided, however, that interest will not be payable on late charges incurred by Tenant, nor on any amounts upon which late charges are paid by Tenant.

IN WITNESS WHEREOF, the parties intending to be legally bound hereby, hereto have set their hands and seals the date first written above.

_____          American Driveline Centers, Inc.
Gary G. Like

                                          By: _____
                                              Marc Graham, President / CEO

Schedule 2.1(d)

### AAMCO Lease Rider

This Rider is attached to and is part of the Lease, between Zary G. Luke ("Landlord") and American Driveline Centers, Inc. (Tenant) dated May 9, 2011 for the premises located at 8844 Kingston Pike, Knoxville, TN 37923 ("Lease") and will remain in effect and apply to any and all renewals, extensions or replacement leases between Landlord and Tenant or their respective heirs, successors and/or assigns.

CONDITIONAL ASSIGNMENT. Tenant hereby conditionally assigns all of the Tenant's right, title, and interest in this Lease to AAMCO Transmissions, Inc. ("AAMCO"). This assignment will become effective only upon occurrence of both of the following conditions.

1. Termination, Rejection or Rescission (but specifically not Expiration or non-renewal) of the Franchise Agreement between AAMCO as franchisor and Tenant as franchisee for the operation of an automotive repair center at the leased premises, and

2. Exercise by AAMCO within thirty (30) days after termination or rescission of the Franchise Agreement of its option to assume the obligations of and to replace Tenant as the Tenant under this Lease as provided in the Franchise Agreement.

Landlord hereby consents to this conditional assignment and hereby agrees that if the conditional assignment becomes effective, AAMCO will thereafter be substituted for Tenant as the Tenant under this Lease. Tenant will be relieved of all liability accruing under this Lease after the effective date of this assignment, but will not be relieved of any liability for prior defaults. AAMCO will not be responsible for the prior defaults of Tenant and will have the right to reassign this Lease to a new franchisee of the location. In the event of such reassignment, AAMCO will be relieved of all liability accruing under this Lease after the date of such reassignment.

Landlord agrees to give AAMCO thirty (30) days prior written notice of its intention to re-enter and repossess the premises and to cancel the Lease on account of Tenant's default of any of the terms, conditions or provisions of the Lease. During this thirty (30) day period, AAMCO may cure such default or otherwise exercise its right under this conditional assignment.

In the event that Tenant fails to exercise its option under this Lease to renew the Lease before its expiration, Landlord agrees to notify AAMCO in writing of Tenant's failure to renew the Lease and AAMCO will then have thirty (30) days from receipt of such notice to exercise any option to renew and to replace Tenant as the Tenant under the Lease.

Tenant agrees that, at such time as AAMCO exercises its option to become the Tenant under this lease, Tenant will immediately vacate the premises without removing any equipment, parts, or supplies except as authorized in the Franchise Agreement and will permit AAMCO to enter upon and take possession of the premises.

Landlord agrees that it will rely solely upon written notice by AAMCO of the termination or rescission of the Franchise Agreement and written notice by AAMCO expressly stating that AAMCO has exercised its option to become the Tenant under the Lease and that such express written communications are the only method by which the option may be exercised by AAMCO. Landlord is relieved of any and all liability to Tenant for any action it takes in relying upon such written notices by AAMCO.

Landlord and Tenant agree that this Rider will remain in effect and apply to any and all Lease renewals, Lease extensions or replacement leases between Landlord and Tenant, or their respective heirs, successors and/or assigns. Any change to the Lease terms or any replacement lease between the parties, their respective heirs, successors and/or assigns, which seeks to change, extinguish or in any way limit the rights accorded AAMCO under this Rider will be ineffective and void as against AAMCO unless approved in writing by AAMCO.

Schedule 2.1(d)

WAIVER OF SUBROGATION. Landlord and Tenant hereby waive any and all rights of action for negligence against each other which may hereafter arise for damage to the demised premises or to property contained therein resulting from any fire or other casualty of the kind covered by a standard fire insurance policy with an extended coverage and vandalism and malicious mischief endorsement, regardless of whether or not, or in what amounts, such insurance is now or hereafter carried by the Landlord and Tenant.

WAIVER OF LIENS. Landlord agrees to sign one or more releases and waivers of liens commonly known as a Landlord's Waiver waiving its Landlord's lien on any or all equipment installed in these premises by Tenant and financed by the vendor or any lending institution, such releases and waivers of liens to be on forms supplied to Landlord by Tenant.

American Driveline Centers, Inc.

By: _____
Marc Graham, President / CEO

Landlord:

_____
Gary G. Luke

AAMCO Transmissions, Inc.

By: _____
Marc Graham, President / CEO

Schedule 2.1(f)
Financial Statements for 4-week period ending August 27, 2011

| | | |
|---|---|---|
| Sales | 61,208 | |
| Revenue - Total | 61,208 | |
| | | |
| Cost of sales-Parts | 15,424 | 25.2% |
| Cost of sales-Labor | 11,913 | 19.5% |
| Gross Profit | 33,871 | 55.3% |
| | | |
| CSM/Admin Wages | 4,551 | 7.4% |
| Employer Taxes | 1,103 | 1.8% |
| Rent & Maintenance | 6,650 | 10.9% |
| Franchise Fees (A) | - | 0.0% |
| Advertising | 2,600 | 4.2% |
| Insurance | 650 | 1.1% |
| Phone & Utilities | 1,004 | 1.6% |
| Towing | 551 | 0.9% |
| Shop Supplies | 673 | 1.1% |
| Office Supplies | 306 | 0.5% |
| Bank Fees | 2,203 | 3.6% |
| Maintenance & Repairs | 515 | 0.8% |
| Other Expenses | 490 | 0.8% |
| Total Expenses | 21,296 | 34.8% |
| | | |
| Operating Income / Pre Owner Draw | 12,575 | 20.5% |

(A) Franchise Owner would be required to pay Royalties of 7.5%

Schedule 2.1(d)

Appendix A

ASSIGNMENT OF LEASE

FOR VALUE RECEIVED, the undersigned American Driveline Centers, Inc. ("Assignor") hereby assigns, transfers and sets over to the undersigned _____ ("Assignee") all rights, title, and interest held by the Assignor in the Lease, dated May 9, 2011 between Assignor and Zary G. Luke for the property located at 8844 Kingston Pike, Knoxville, TN 37923, to which this Appendix is attached, which also includes the AAMCO Lease Rider.

The Assignor warrants and represents that the Lease is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all of the remaining obligations under the Lease and agrees to indemnify and hold the Assignor harmless from any claim or demand resulting from non-performance by the Assignee.

Except for the rights contained in the Lease that exclusively enure to the benefit of Assignor, Assignee will be entitled to all remaining rights under the Lease, which rights are also assigned hereunder.

The Assignor warrants that the Lease is without modification, and remains on the terms contained therein.

The Assignor further warrants that it has full right and authority to transfer said Lease and that, to the best of its knowledge, the Lease rights herein transferred are free of lien, encumbrance, or adverse claim.

This assignment is binding upon and enures to the benefit of the parties, their heirs, predecessors, successors, and assigns.

IN WITNESS WHEREOF, the parties intending to be legally bound hereby, hereto have set their hands and seals this _____ day of _____ 201__.

Assignor:
American Driveline Centers, Inc.


By: _____
        Marc Graham, President

Assignee:

_____

_____

_____
Printed name (and title if applicable)

Schedule 2.1(d)

## Appendix B
## LEASE GUARANTY

THIS LEASE GUARANTY ("**Guaranty**") is made this ___ day of _____, 20__ by
_____ (individually or collectively, the "**Guarantor**") in favor of Zary
G. Luke ("**Landlord**") on behalf of _____ (individually or collectively,
the "**Tenant**").

### RECITALS

R-1.   Landlord is about to accept an assignment of a certain lease of even date herewith
("**Lease**"), pursuant to which Landlord will lease to Tenant certain premises located at 8844 Kingston
Pike, Knoxville, TN 37923 (the "**Premises**"); and

R-2.   Landlord has agreed to enter into the Lease upon the express condition that this Guaranty
be executed and delivered by Guarantor.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce
Landlord to enter into the Lease, Guarantor hereby covenants and agrees with Landlord, its successors and
assigns, as follows:

1.      Guaranty. Guarantor hereby guaranties, as a guarantor of payment and performance,
and not merely as surety or guarantor of collection, to Landlord and its successors and assigns the due,
complete and punctual payment of all amounts which are or may become due and payable by Tenant
under the Lease, and the due, complete and punctual performance of all other agreements and
undertakings of Tenant under the Lease, in each case in accordance with the terms of the Lease (such
obligations being herein collectively called the "**Guaranteed Obligations**"). In furtherance and not in
limitation hereof, Guarantor does hereby agree that in the event Tenant does not or is unable to
punctually and completely pay or perform the Guaranteed Obligations for any reason (including,
without limitation, because of the liquidation, dissolution, receivership, insolvency, bankruptcy,
general assignment for the benefit of creditors, reorganization, arrangement, composition or
readjustment of or other similar proceedings affecting the status, existence, assets or obligations of,
Tenant or the limitation of damages from the breach or the disaffirmance of any of the Guaranteed
Obligations in any such proceeding or the operation of any other law or other legal proceeding), then
Guarantor shall pay the rent or other amounts provided to be paid by Tenant under the Lease or such
other sums or amounts equal thereto and perform Tenant's obligations under the Lease.

2.      Obligations Unconditional. Guarantor agrees that this Guaranty shall be continuing, and
that the Guaranteed Obligations will be paid and performed in accordance with their terms and are
absolute and unconditional, irrespective of the value, genuineness, validity, legality, regularity or
enforceability or lack thereof of the Lease, or the existence of any other guaranty of or security for any
of the Guaranteed Obligations, or any substitution, release or exchange of any other guaranty of or
security for any of the Guaranteed Obligations, it being the intent of this paragraph and the agreement
of the parties hereto that the obligations of Guarantor hereunder shall be absolute and unconditional.
Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of
the following shall not affect the liability of Guarantor hereunder:

(i)      at any time or from time to time, without notice to Guarantor, the time for any
performance of or compliance with any of the Guaranteed Obligations shall be extended, or such
performance or compliance shall be waived;

(ii)     any waiver, modification, rescission or change in time, place or manner of the
performance of any of the terms of the Lease or the Guaranteed Obligations in any respect in
accordance with their respective terms;

(iii)    any legal disability, incapacity or other similar defense of Tenant;

Schedule 2.1(d)

(iv)    Tenant's entering into the Lease being invalid or in excess of the powers of Tenant, or of any person purporting to act on its behalf;

(v)    the release or substitution of the Tenant or any other guarantor; and

(vi)    the partial payment or performance of the Guaranteed Obligations (whether as a result of the exercise of any right, remedy, power or privilege or otherwise) shall be accepted or received.

Guarantor hereby expressly waives diligence, presentment, demand of payment or performance, protest and all notices of default and all other notices whatsoever, and any requirement that the Landlord (a) file suit or proceed to obtain or assert a claim for judgment against Tenant, (b) make any other effort to obtain payment or performance of any Guaranteed Obligation from Tenant, (c) foreclose against or seek to realize any security now or hereafter existing for any Guaranteed Obligation, (d) exercise or assert any other right or remedy to which Landlord is or may be entitled in connection with any Guaranteed Obligation of any security or any other guaranty therefor, (e) assert or file any claim against the assets of Tenant, or (f) exhaust any right, power or remedy or proceed against Tenant under the Lease, or against any other person under any other guaranty of, or security for, or any other agreement regarding, any of the Guaranteed Obligations.

3.    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in full force and effect and be binding on Guarantor in accordance with its terms until such time as all of the Guaranteed Obligations are finally paid, performed and observed in full.

4.    Joint and Several Obligations.  The obligations of Guarantor hereunder are joint and several and independent of the obligations of Tenant, and a separate action or actions may be brought and prosecuted against any Guarantor, whether or not action is brought against Tenant or any other guarantor, or whether or not Tenant or any other guarantor be joined in such action or actions.

5.    Waivers.  To the full extent Guarantor may do so, Guarantor hereby waives the benefit of homestead and all other exemptions to which Guarantor may be entitled, and further waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notices of non-payment, non-performance, or non-observance, or other proof, or notice of demand. **Guarantor waives all rights to trial by jury in any action or proceeding instituted by or against Landlord which pertains directly or indirectly to this Guaranty or the Lease, to any alleged tortious conduct by Guarantor, Tenant or Landlord, or, in any way, directly or indirectly, arising out of or related to the relationship between Guarantor, Tenant and Landlord.**

6.    Governing Law.  This Guaranty shall be construed and interpreted under the laws of the State of Tennessee (but not including the choice of law rules thereof).

7.    Jurisdiction and Venue.  Guarantor consents to the exercise of personal jurisdiction over Guarantor by any federal or state court in the State of Tennessee and consents to venue in any jurisdiction or locality in the State of Tennessee.

8.    Notices.  All demands, notices and other communications hereunder shall be sent and become effective as provided for in the Lease.  Notices to Guarantor shall be addressed to

9.    Severability.  Should any of the provisions of this Guaranty be or become fully or partially invalid or unenforceable, the other provisions hereof shall remain enforceable and in full force and effect.

10.    Successors and Assigns.  This Guaranty shall extend to and be binding upon Guarantor and their heirs, personal representatives, successors and assigns and shall inure to the benefit of and may be enforced by Landlord and its successors and assigns.

11.    Assignment.  Landlord may, without notice to Guarantor, assign this Guaranty to any entity succeeding to Landlord's interest in the Lease and no such assignment or transfer of the Lease will operate to extinguish or diminish the liability of Guarantor hereunder.  Any assignment by Tenant

Schedule 2.1(d)

of the Lease or assignment by Guarantor of this Guaranty will not operate to extinguish or diminish the liability of Guarantor hereunder.

      12.    <u>Delay; Cumulative Remedies</u>. No delay or failure by Landlord to exercise any right or remedy against Guarantor will be construed as a waiver of that right or remedy. All rights and remedies of Landlord against Guarantor herein set forth are cumulative and shall be in addition to all rights and remedies provided Landlord by law, statute, at equity or otherwise.

      13.    <u>Attorneys' Fees</u>. In addition to payment of the Guaranteed Obligations, Guarantor guarantees payment of all reasonable attorney's fees and collection costs incurred by Landlord in enforcement of this Guaranty.

      14.    <u>Definitions</u>. All terms with initial capitalization and not defined herein, shall have the meaning set forth in the Lease.

      15.    <u>Lease</u>. Guarantor hereby represents and warrants to Landlord that they (i) have read each and every provision of the Lease and this Guaranty; (ii) have consulted with, or been given the opportunity to have the Lease and this Guaranty reviewed by, competent legal counsel of their choosing; and (iii) understand, agree to and accept the provisions hereof.

      IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed under seal as of the day and year first above written.

WITNESS/ATTEST:              GUARANTOR:

_____      _____ (SEAL)

_____      _____ (SEAL)

Schedule 6.4(a)

**BILL OF SALE**

The undersigned, AMERICAN DRIVELINE CENTERS, INC., a Pennsylvania corporation, ("SELLER") for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby sells, assigns, transfers and delivers to Gerald H. Hansen ("BUYER"), and his successors and assigns forever, all of SELLER's right, title and interest in and to the Purchased Assets listed in Schedule 1.1(a) of the Agreement of Sale to which this Schedule 6.4(a) Bill of Sale is attached.

The undersigned herein covenants, agrees and warrants that it is the owner of the Purchased Assets and that, to the best of its knowledge, the same is free from all liens and encumbrances and that it will defend the sale of said property hereby made against all and every person or persons whomsoever, lawfully claiming the same or any part thereof.

This Bill of Sale is delivered pursuant to the Agreement for Sale dated as of September 30, 2011 by and between SELLER and BUYER (the "Agreement") and is subject to the conditions, representations, warranties and covenants provided for therein. All exhibits referred to herein are exhibits to this Bill of Sale.

IN WITNESS WHEREOF, SELLER has caused this Bill of Sale to be duly executed on this ___ day of _____ 2011.

AMERICAN DRIVELINE CENTERS, INC.


By: _____
      Michael Sumsky, Executive VP - CFO